LOBRANO, J., DISSENTS WITH REASONS TO FOLLOW
JENKINS, J., DISSENTS
I respectfully concur in part and dissent in part from the majority opinion.
I agree with the majority's ruling against St. Bernard Port, Harbor & Terminal District ("St. Bernard Port")[1] and in favor of Violet Dock Port Inc., LLC ("Violet Port"),[2] finding that the $16 million deposited into the registry of the court on December 22, 2010, the date of the expropriation under Louisiana's "quick-taking" statutes, La. R.S. 19:141, et seq.[3] was a deficient amount to compensate Violet Port to the "full extent of loss" as required by La. Const. Art. I, § 4 (B)(5).[4] However, I disagree with the majority's finding that an additional award of $12,764,685 fully compensates Violet Port for the quick-taking of its private property. Instead, I find Violet Port is entitled to an additional amount of $22,017,803.[5]
*64 Accordingly, based on a de novo review of the record, I find that Violet Port met its burden of proof that St. Bernard Port's estimated initial compensation of $16 million was deficient. I would award Violet Port the following: (1) the deficient amount of $22,017,803, pursuant to La. Const. Art. I, § 4 (B)(5) and La. R.S. 19:156 ;[6] (2) interest on this deficient amount from the date of the quick-taking, December 22, 2010, to the date of final payment, pursuant to La. R.S. 19:155 ;[7] and (3) reasonable attorney's fees, as authorized by La. R.S. 19:8(A)(3).[8] I would amend the December 1, 2015 judgment accordingly and affirm. I would remand the case to the district court for a determination of interest and attorney's fees as was ordered in the majority opinion.
My award is based on a comprehensive analysis of the most realistic, fair, and reasonable valuations provided by the experts and supported by the evidence that accurately reflects the full extent of Violet Port's loss as determined under a preponderance of the evidence standard and a "full extent of loss" constitutional mandate. I find that the majority's analysis is flawed for two reasons. First, the majority failed to fully compensate Violet Port for the full replacement cost of its improvements located on the taken property, contrary to La. Const. Art. I, § 4 (B)(5) and State Through Dep't of Highways v. Constant, 369 So.2d 699, 701-702 (La. 1979). Second, with respect to the valuation of the land and batture, although the majority recognized the many unique and valuable attributes of the land and batture, it failed to give sufficient weight to these attributes when it accepted the lowest valuation among the four appraisers, contrary to La. Const. Art. I, § 4 (B)(5) and to the principles set forth in St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., LLC, 17-0434, p. 16 (La. 1/30/18), 239 So.3d 243, 255 (where the Court noted that our de novo review should recognize that "[i]nadequate *65 and inaccurate valuations run rampant and we must strive to find valuations that serve the purpose of protecting property rights while allowing public interests to be served." (quoting Exxon Pipeline Co. v. Hill, 00-2535, 00-2559, p. 18 (La. 5/15/01), 788 So.2d 1154, 1166 ) ) (hereinafter " Exxon Pipeline ").
Furthermore, my determination of just compensation is based on a de novo review of the entire record and is in accordance with La. Const. Art. I, § 4 (B)(5)(where a private property owner is entitled to just compensation to the "full extent of his loss," which "shall include, but not be limited to, the appraised value of the property and all costs of relocation, inconvenience, and any other damages actually incurred because of the expropriation"). I further adhere to the principles and guidelines set forth in the following four Louisiana Supreme Court decisions: (1) Exxon Pipeline, 00-2535, 00-2559, pp. 12-13, 788 So.2d at 1162, (the Court noted three generally accepted accounting appraisal techniques: (a) the market method where the appraiser considers the market value estimate which is predicated upon prices paid in actual market transactions and current listings, i.e. comparable sales; (b) the cost method where the appraiser derives the value of the property by estimating the replacement or reproduction cost of the improvements and deducting therefrom any estimated depreciation, if any,[9] and then by adding the market value of the land, if any; and (c) the income method where the appraiser uses an appraisal technique in which the anticipated net income is processed to indicate the capital amount of the investment which produces the net income); (2) Constant, 369 So.2d at 701-02 (where the Court held that the phrase "full extent of the loss" in La. Const. Art. I, § 4 (B)(5) means that the private property owner must "be put in as good a position pecuniarily as he would have been had his property not been taken" and the fact that a just compensation award may exceed the market value of the property taken is "not constitutionally significant");[10] (3) State, Dep't of Transp. and Dev. Co. v. Dietrich, 555 So.2d 1355, 1358 (La. 1990) (where the Court held that La. Const. Art. I, § 4 (B)(5) permits compensation in excess of market value because "the landowner should be compensated for 'his loss' not merely the loss of the land"); and (4) St. Bernard Port, 17-0434, p. 16, 239 So.3d at 255 (where the Court noted that "opinions of experts regarding valuation are advisory and are used only to assist *66 the court in determining the amount of compensation due in an expropriation case and the courts need not accept in toto the testimony of any one group or group witnesses").
I am also mindful of our recent case of Bd. of Sup'rs of Louisiana State Univ. and Agric. and Mech. Coll. v. Villavaso, 14-1277 (La.App. 4 Cir. 12/23/15), 183 So.3d 757, writ denied, 16-0161 (La. 3/24/16), 190 So.3d 1193. In Villavaso , LSU expropriated a parking lot to facilitate the construction of a new academic medical center. The property was located near the Superdome and the Central Business District. The property owner had used it for special parking events and some daily parking for the eleven years that he owned the property. We recognized that:
[I]n this case, the property was both unique in nature due to its location, and indispensable to Villavaso's business. See Constant, 369 So.2d at 706. As Villavaso testified at trial, his property was situated in a location convenient to the Superdome with exceptional access to the interstate, both I-10 East and West. The location enabled customers to quickly access the interstate, bypassing much of the game day and event traffic. As a result, he had cultivated a network of regular customers who sought out his parking lot in particular for its unique features. He also testified that he had looked for, but had been unable to find, a comparable location to relocate his business. Thus, by taking Villavaso's land, LSU also effectively took his business, and under our Constitution, Villavaso is entitled to be fully compensated for that loss.
Id., 14-1277, p. 12, 183 So.3d at 765.
The property owner was awarded, among other things, for the land taken and business loss noting that the Louisiana Supreme Court "has endorsed an approach that makes a landowner truly whole, without prescribing a specific methodology to determine such compensation." Our Court affirmed the award to the property owner citing State v. Estate of Davis, 572 So.2d 39, 42 (La. 1990), as follows:
*67 [S]ince expropriation proceedings derogate from the right of individuals to own property, the law governing these proceedings is strictly construed against the expropriating authority.
Villavaso, 14-1277, p. 7, 183 So.3d at 763. See also State, Through Dep't of Highways v. Jeanerette Lumber & Shingle Co., Ltd., 350 So.2d 847, 855-56 (La. 1977) ("Expropriation 'is special and exceptional in character, in derogation of common right, and must be strictly construed.' " quoting Orleans-Kenner Electric Ry. Co. v. Metairie Ridge Nursery Co. , 136 La. 968, 68 So. 93 (1915) ).
In the case sub judice , the experts applied different methods of accounting to assist the parties and courts in valuing the property. With respect to the cost method of appraisal, each of the four experts calculated the full replacement cost of the improvements with a deduction for depreciation, plus market value of the land and batture. These cost method amounts were as follows: Michael W. Truax, St. Bernard Port's appraiser, valued at $21,650,000; Bennet Oubre, St. Bernard Port's appraiser, valued at $27,477,404; Heyward M. Cantrell, Violet Port's appraiser, valued at $50,926,443; and Dr. Wade Ragas, Violet Port's appraiser, at $51,500,000.[11] None of the experts performed an analysis under a "full extent of loss" standard, pursuant to La. Const. Art. I, § 4 (B)(5), because this analysis is the function of the courts. The majority failed to perform this analysis in its acceptance of Oubre's cost method of appraisal regularly used for accounting and tax purposes. Although the determination of fair market value by use of the cost method usually includes a reduction for depreciation, our Louisiana Supreme Court has recognized that in expropriation cases, where the property owner is entitled to damages equal to the "full extent of loss," a property may have such unique and irreplaceable characteristics that a reduction for depreciation is not warranted, even though such an award may result in a perceived windfall to the property owner.
I do not accept any one appraiser's amounts. As recognized by the Louisiana Supreme Court, "the power of the State and private entities authorized by law to take property competes with the sacred and fundamental rights of citizens to own, control, use, enjoy, protect, and dispose of property." Exxon Pipeline, 00-2535, 00-2559, p. 18, 788 So.2d at 1166 (J., Knoll, concurring). As such, it is our job as the finder of fact, to balance those competing interests based on all the evidence in the record and the totality of the circumstances. As further stated by the Court in State, Dep't of Transp. & Dev. v. Schwegmann Westside Expressway, Inc. , 95-1261, p. 6-7 (La. 3/1/96), 669 So.2d 1172, 1176 :
*68 "[A] trier of fact does not have to accept in toto the testimony of any one group or group witnesses."
Using the cost method of appraisal, it seems the majority arrived at the total value of the property ($28,784,625) by first estimating the replacement cost of the improvements with depreciation ($24,802,685) and then by adding the market value of the land ($1,843,000) and the market value of the batture ($2,119,000). I disagree with the majority's valuation findings and derive at the total value of the property ($38,017,803) by first estimating the full replacement cost of the improvements without depreciation ($29,000,000) and then adding the market values of the upland ($3,857,238), Plot Y ($35,565), and batture ($5,125,000). I find that these valuations, based on a preponderance of the evidence, reasonably reflect that amount which fully compensates Violet Port "to the full extent of ... [its] loss" as required by La. Const. Art. I, § 4 (B)(5) and as more fully explained below.
I. BACKGROUND
Violet Port owned and operated a 75-acre industrial port facility ("Violet Port site") in St. Bernard Parish and was a privately-held family business in operation for over 40 years prior to the quick-taking. The facility utilized two tracts of land located within St. Bernard Parish's levee system: (1) 38.5 acres on the west side of St. Bernard Highway/State Highway 46 ("upland") and (2) approximately 4 acres on the east side of the highway ("Plot Y"). The Violet Port site also consisted of 12.3 acres of river levee and one mile (4,200 linear feet) of deep-water frontage on the Mississippi River totaling approximately 22 acres located outside the levee ("batture"). The batture was on a relatively straight section of the river that was self-scouring.[12] Violet Port's one mile of river-front property was contained within the ten miles of river-front property located in St. Bernard Port's jurisdiction.
Over many years, Violet Port had built and improved its port facility by reinvesting its profits to construct various site improvements on the property including five steel and concrete docks, numbered 1 through 5.[13] At the time of the quick-taking, Violet Port had a thirty-plus year business relationship with the United States Navy, Military Sealift Command ("Navy"), to berth and service ocean-going Navy ships. At the time of the quick-taking, Docks 1, 2, and 5 were used to layberth Navy ships. Dock 4 was being used to further Violet Port's development of its solid bulk cargo operations.[14] Violet Port was actively negotiating with Vulcan Materials, Co. ("Vulcan"), a large solid and liquid bulk aggregate company, to establish a business relationship between the two companies. More than a year preceding the quick-taking, Vulcan had approached Violet Port about leasing Dock 4 and ten adjoining acres to transload and store aggregate solid bulk *69 cargo.[15] At the time of the quick-taking, Dock 4's improvements were almost complete. Dock 3 was the only dock that had not undergone extensive renovations in the preceding ten years of the quick-taking and was considered to be in poor condition. Before the quick-taking, Dock 3 could accommodate cranes up to fifteen tons and was used to berth barges, fill water barges, and make some topside repairs.
At the time of the quick-taking, the Violet Port site's access to river and road transportation enabled Violet Port to use the property for layberthing and topside ship repairs. Further, the property's access to river, road, and rail transportation also enabled Violet Port to use and/or market the property for limited solid bulk cargo operations. The property's access to these three forms of transportation, particularly ships, trucks, and trains, would equally enable St. Bernard Port to use the property for liquid bulk cargo operations. In addition, the property had access to electricity, water, sewerage, natural gas, telephone, docks, and other site improvements, all of which were needed for all types of usage, including layberthing, topside ship repairs, and solid and liquid bulk cargo operations.[16]
In areas south of New Orleans, private market demand for river access property featuring access to river, road, and rail transportation capable of transloading solid and liquid bulk cargo had grown over the years, exceeding the supply of available properties in St. Bernard Parish. By 2008, St. Bernard Port was operating at full capacity. In its October 2008 "Strategic Business Plan, 2008-2010," St. Bernard Port recognized that "[l]and on the Mississippi River is finite and already limited. Greenfield sites along the Mississippi River should be considered a national asset for transportation and manufacturing (i.e., the Violet site.)" With regard to the Violet Port facility, St. Bernard Port stated: "It is not expected that any significant maintenance expenses will be incurred by the Port during the 10-year period of this analysis." In 2009, a personal inspection by an engineer hired by St. Bernard Port indicated that the Violet Port docks and ramps "appear to be structurally sound and in good shape."
In late 2008, St. Bernard Port submitted a Port Priority Application ("PPA") for funding to the Louisiana Port Construction and Development Program ("LPCDP") FY 2009-10 requesting the maximum allowable funding of $15 million from the Port Priority Program. This program is administered by the Louisiana Department of Transportation and Development ("DOTD"). The $15 million was sought to perform "Phase 1. Acquisition and Development of the Violet Site."[17] The 2008 PPA stated that in addition to the $15 million from the Port Priority Funds, St. Bernard Port was contributing $1.66 million in funds and Associate Terminals of St. Bernard, LLC ("Associated Terminals") was contributing $1.77 million for equipment acquisition costs, for *70 a total of $18,757,000. Associated Terminals was the private company that already handled most of the cargo operations at St. Bernard Port and eventually took over operations of Violet Port.[18] It was intimately involved in the preparation of the 2008 PPA to acquire and develop Violet Port.[19]
The 2008 PPA stated:
But, from our perspective, we need additional space now to store dry bulk product on the ground, in rail cars, and in barges. The Violet Site offers us the opportunity to do that in the short term , with a minimum of capital investment, other than the cost of acquiring the existing facilities. [Emphasis added.]
Of specific importance in the 2008 PPA is the statement under the heading of "Alternatives:"
In order for the Port to expand its operations on the Mississippi River, it needs additional river frontage and land. This site offers both land and river frontage, plus three existing docks that can be put into use immediately. There are only a couple of other sites in St. Bernard Parish that could possibly be developed for deep draft shipping-at Meraux and Poydras-but both of these have significant constraints. The Meraux site is in a severe bend of the river and would impede river traffic; the Norfolk Southern railroad is at the landside toe of the levee and would have to be relocated; and, it's not for sale.
The site at Poydras, a former crevasse, is in an even more severe bend of the river, which would impede river traffic. It is, also, all batture, there are no uplands to support landside operations. Adjacent land inside the level is already developed residentially.
(Emphasis added.)
Referring to the adequacy of components at the Violet Port site, the 2008 PPA stated:
All the necessary components are in place and adequate to serve a marine terminal: St. Bernard Highway, the Norfolk Southern Railroad, electricity, water, and sewerage.
In a letter submitted in connection with 2008 PPA, St. Bernard Port identified the Navy lease and represented to the DOTD that "the port will derive from this proposed project a lease with the Navy ships/MARAD in the approximate amount of $550,000 per year...occupying the berths," and that future yearly revenue from the lease could be expected to continue in that amount.
In the 2008 PPA, St. Bernard Port recognized:
Since the Violet Dock site is a unique facility, located on the Mississippi River with three active docks, and since there have been few comparable sales in recent years, it is very difficult to set a fixed price.
After meeting with two individuals from the Port Priority Program, St. Bernard Port prepared a January 2009 supplemental report ("2009 Supplemental Report") to *71 answer questions raised in response to its 2008 PPA. It reads:
The Violet Docks present a unique opportunity to greatly expand the Port's capabilities with regards to handling bulk cargoes. The St. Bernard area continues to be attractive to importers of bulk commodities due to its location on the river which translates into lower transportation costs. Further, these shippers frequently have the desire to transfer cargo to rail or truck, both of which are possible at the Violet docks.
Finally, St. Bernard Port stated in pertinent part:
The best attribute of this site is that it features three sturdy docks designed to berth some of the largest cargo ships in the world. These docks can be easily modified to support cargo handling operations similar to those currently taking place at the Chalmette Slip, such as ship or barge to truck or rail or to storage. The reverse movement is also available.
In 2010, the DOTD awarded St. Bernard Port the maximum allowable funding of $15 million in Port Priority funds as a result of its 2008 PPA. St. Bernard Port then passed a resolution authorizing it to file a petition for the quick-taking of Violet Port's property pursuant to Louisiana's quick-taking statutes.
II. PROCEDURAL HISTORY
On December 22, 2010, St. Bernard Port filed a petition for expropriation, alleging that its public purpose was to "spur economic development by constructing a tri-modal dry and liquid bulk cargo facility to be operational in eight to ten years." As estimated compensation to Violet Port for the quick-taking, the St. Bernard Port deposited $16 million into the registry of the court. St. Bernard Port claimed that Violet Port was the only site suitable for liquid and solid bulk cargo operations and was "chosen after due consideration of possible alternative locations, along with related factors including costs, long-range planning, and safety considerations."
After a lengthy trial, the district court in St. Bernard Parish held that the quick-taking was constitutionally permissible and awarded Violet Port the sum of $16 million to fully compensate it for its loss, the exact amount deposited by St. Bernard Port into the registry of the court. In a 2-1 decision, this Court affirmed the district court on appeal. St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., LLC , 16-96,16-262, 16-331 (La. App. 4 Cir. 12/14/16), 229 So.3d 626[20]
After granting Violet Port's writ application,[21] the Louisiana Supreme Court issued an opinion in which it examined expropriations by governmental bodies. In a 4-3 decision of the Court in *72 St. Bernard Port, 17-0434 (La. 1/30/18), 239 So.3d 243, it stated:
In 2005, the United States Supreme Court decided the case Kelo v. City of New London , 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005) which expressly upheld a taking for economic development purposes. Following Kelo , in 2006, voters of Louisiana approved a constitutional amendment enumerating permissible "public purposes" for a political subdivision to expropriate private property. As amended, art. I, § 4 provides, in pertinent part:
Section 4. (A) Every person has the right to acquire, own, control, use, enjoy, protect, and dispose of private property. This right is subject to reasonable statutory restrictions and the reasonable exercise of the police power.
(B)(1) Property shall not be taken or damaged by the state or its political subdivisions except for public purposes and with just compensation paid to the owner or into court for his benefit. Except as specifically authorized by Article VI, Section 21 of this Constitution property shall not be taken or damaged by the state or its political subdivisions: (a) for predominant use by any private person or entity; or (b) for transfer of ownership to any private person or entity.
(2) As used in Subparagraph (1) of this Paragraph and in Article VI, Section 23 of this Constitution, "public purpose" shall be limited to the following:
* * *
(b) Continuous public ownership of property dedicated to one or more of the following objectives and uses:
* * *
(vi) Public ports and public airports to facilitate the transport of goods or persons in domestic or international commerce .
* * *
(Emphasis added.)
In other words, the Louisiana Constitution expressly includes "public ports" as an enumerated "public purpose." Specifically, a public purpose is defined as "[p]ublic ports... to facilitate the transport of goods or persons in domestic or international commerce." La. Const. art. I, § 4 (B)(2)(b)(vi).
Consistent with the authority given to public ports to expropriate property, the trial court made a factual determination that the Port's purpose for expropriation was to "build and operate a terminal to accommodate transport of liquid and solid bulk commodities into national and international commerce to and from St. Bernard." This purpose falls squarely within the constitutional definition of "public purpose" for public ports. La. Const. art. I, § 4 (B)(2)(b)(vi). Based on the record before us, we cannot say that the trial court's finding was manifestly erroneous, and we therefore affirm the finding that this expropriation was for a public purpose. We also find that this expropriation satisfies the broad definition of public purpose under federal law.See Kelo , 545 U.S. at 479, 125 S.Ct. 2655 ("Without exception, our cases have defined that concept broadly, reflecting our longstanding policy of deference to legislative judgments in this field.").
Id., 17-0434, pp. 8-10, 239 So.3d at 250-51. (Footnotes omitted; emphasis added.)
After finding that the quick-taking was for a public purpose and, therefore, constitutional, the Court remanded the matter to this court for a determination of "just compensation," based on a de novo review of the record.
*73 Our instructions from the Court on remand are clear:
Turning to the standard by which we review the trial court's findings, in an expropriation proceeding, the trial court's factual determination as to the value of the property will not be disturbed in the absence of manifest error. West Jefferson Levee Dist. , 640 So.2d at 1277. "However, where one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine a preponderance of the evidence." Evans v. Lungrin , 97-0541 (La. 2/6/98), 708 So.2d 731, 735. See also West Jefferson Levee Dist. , 640 So.2d at 1278. Legal errors occur when a trial court applies incorrect principles of law and those errors are prejudicial; when such a prejudicial legal error occurs, the appellate court is required to review the record and determine the facts de novo. Evans , 708 So.2d at 735.
Here, we find the trial court used the incorrect standard for evaluating experts' valuation testimony. Explaining why it accepted the Port's expert testimony rather than Violet's, the court stated: "It is the opinion of this Court that it does not have the discretion to 'split the baby' and arrive at a valuation somewhere in between" the two expert opinions. This is erroneous. A trier of fact is not required to make a binary choice and accept one side's testimony in its entirety, but is instead empowered to weigh strengths and weaknesses of expert testimony. To the extent the trial court held otherwise, this is legal error.See West Jefferson Levee Dist. , 640 So.2d at 1277 ("The opinions of experts regarding valuation are advisory and are used only to assist the court in determining the amount of compensation due in an expropriation case."). See also , e.g. , State, Dep't of Transp. & Dev. v. Schwegmann Westside Expressway, Inc. , 95-1261, p. 6-7 (La. 3/1/96), 669 So.2d 1172, 1176 ("[A] trier of fact does not have to accept in toto the testimony of any one group or group witnesses."). Further, this error was prejudicial to Violet insofar as the trial court set just compensation in the exact amount put forward by the Port's experts.
The court of appeal compounded this error by failing to identify it and conduct a de novo review. St. Bernard Port I , 229 So.3d at 634-35 (noting that "we cannot find that the trial court was manifestly erroneous or clearly wrong in its ruling that $16,000,000 was just compensation for the property"). Instead, the court of appeal noted the general proposition that a factfinder has "broad discretion" in determining weight to be given to expert testimony. Id. While this is, of course, a correct statement of the law, it overlooks that the trial court was apparently operating under an incorrect belief about the extent of its ability to exercise that broad discretion.
In summary, we find that the lower courts erred in the determination of just compensation. We therefore remand this matter to the court of appeal solely for the purpose of fixing the amount of just compensation based on the evidence in the record and in accordance with the principles set forth in this opinion.See Gonzales v. Xerox Corp. , 254 La. 182, 320 So.2d 163, 165 (1975) (remand to appellate court, rather than trial court, is appropriate when the appellate court has all the facts before it); Buckbee v. United Gas Pipe Line Co. , 561 So.2d 76, 87 (La. 1990). See also *74 Exxon Pipeline , 00-2535, 00-2559, p.18, 788 So.2d at 1166 (Knoll, J., concurring) ("[V]aluation of property in expropriation cases is an open question and each case should be judged on its own under its individual facts and circumstances. Inadequate and inaccurate valuations run rampant and we must strive to find valuations that serve the purpose of protecting property rights while allowing public interests to be served. "). Although this Court, like the court of appeal, has appellate jurisdiction of both law and fact and may perform an independent review and render judgment on the merits, see La. Const. art. V, § 5 (C), we prefer that the court of appeal perform the first appellate review of the entire record under the correct rule of law. Buckbee , 561 So.2d at 87.
Id., 17-0434, pp. 14-16, 239 So.3d at 254-55. (Footnote omitted; emphasis added.)
III. SUMMARY OF RELEVANT TESTIMONY
As a result of a review of the record in this case, I find the following testimony critical to an analysis of the issue of "just compensation," that we are required to determine:[22]
A. Testimony Presented by St. Bernard Port
St. Bernard Port's first witness was Robert J. Scafidel, Ph.D.,[23] St. Bernard Port's Executive Director since 1998. He testified that St. Bernard Port submitted the 2008 PPA to the LCPDP, "Development of the Violet Site, Phase I." Although St. Bernard Port would be developing the site in three phases,[24] St. Bernard Port was first seeking an initial $15 million from the state to fund Phase I.[25] The application represented that the site had good access over road, rail, and water; it would be great for "maritime shipping, cargo operations, and stevedoring operations." "With respect to the river, site is located in a gentle curve of the Mississippi, with a moderate to deep water bank line. Further, the property has a favorable location regarding the steerage channel, which is more or less midstream at this location."
The 2008 PPA also noted that the U.S. Corp of Engineers had permitted Violet Port to moor large vessels, as many as three abreast; it represented that the docks could handle some of the largest cargo ships in the world. It also had electricity, water, natural gas, telephone (six lines per ship), and sewerage on site. As for ancillary facilities, the 2008 PPA stated that these included: interior circular roads; parking lots; security gates; perimeter and interior security fencing for the crews and maintenance personnel aboard the ships; and an office building.
Scafidel testified that St. Bernard Port would not incur significant maintenance expenses over the next ten years. An inspection, *75 by an engineer hired by St. Bernard Port in January 2009, revealed that three of the docks were structurally sound, in good shape, and could be used immediately as heavy-duty docks.
In its 2008 PPA, St. Bernard Port described the Violet Port property: "The acquisition and development of the Violet site is an unusual project, perhaps unique within the experience of the Louisiana Port Construction and Development Priority Program." (Emphasis added.)
Scafidel stated that St. Bernard Port would be turning the property over to a private entity, Associated Terminals, to operate the site; Associated Terminals ran the St. Bernard Port facility. In addition to cargo services, it would also service the Navy contracts held by Violet Port at the time of the quick-taking.
St. Bernard Port's next witness was Michael W. Truax, who had a degree in engineering, was a certified real estate appraiser, and accepted by the court as an expert in both. On January 29, 2013, he prepared an update to his original August 27, 2010 appraisal for the valuation of the Violet Port site as of the date of quick-taking, December 22, 2010. In his 2010 appraisal, he appraised the value of the property to be $16 million; this amount did not change in his 2013 revised appraisal. The appraisal was for a "leased fee" rather than a "fee simple" analysis.[26] However, he stated that a leased fee analysis at market rent is equivalent to a fee simple analysis.
In his original report, Truax performed a highest and best use analysis. As vacant land, the upland's best use was for industrial development. As for the batture, its potential uses would include construction of a layberth/ship dock facility and construction of a marine service facility. Truax's report stated that the most typical uses for a batture are for development with a ship dock or marine service facility and/or barge fleeting. He believed that Plot Y should be sold separately for speculation.
As improved, Truax stated that layberthing and topside repairs could continue at Docks 1, 2, and 5. Because Dock 4 was under construction, he did not know if aggregate solid bulk cargo operations could take place there.[27] He was looking for the economic value of the docks and site improvements, which in his opinion was the full replacement cost less depreciation. He testified that the economic value of the site improvements was $290,000 after depreciation. He estimated the replacement cost of the docks to be $30,955,980 before depreciation was deducted.[28] Depreciation *76 of the docks was estimated based on what he called "an age life premise." Using an age life premise of thirty years for the docks, he determined the effective age of each dock and then deducted depreciation arriving at a total of $17,069,269. After adding in his estimate of total site value of $4,580,000 (upland-$2,130,000, including $43,745 for Plot Y; batture-$2,450,000), his total value indication was $21,650,000.
Truax also applied an income approach to value the property. This is a valuation method whereby one projects the rental income that a property can be derived by being put to its highest and best use. This analysis yielded a property assessment of $12,550,000 to $13,500,000. After looking at the factors and recognizing that appraisals can be somewhat subjective, he concluded that $16 million was a reasonable value.
The next witness testifying for St. Bernard Port was Bennet Oubre, who was also accepted as an expert in real estate appraisal.[29] Oubre has been an appraiser for all of his career and works through his real estate and brokerage firm, A.R.E. Real Estate Services, where he was the senior appraiser. Oubre was hired by St. Bernard Port to perform three tasks: (1) perform an appraisal review of the August 2010 report prepared by Truax; (2) perform a separate and independent evaluation of the Violet Port site that would conform to just compensation methodologies; and (3) prepare an appraisal review of Violet Port's appraisers. Based on his review of Truax's appraisal and relevant market data available on December 22, 2010, he testified that Truax's appraisal was credible.[30]
In his report of December 15, 2010, Oubre stated that the highest and best use of the property as vacant land was to "hold for future marine/industrial development, and as improved to continue its use as a marine lay-berth facility." With this in mind, he appraised the land ($1,843,328 for 1,843,328 square feet at $1.00 per square foot) and the batture ($2,119,000 for 4,238 linear feet at $500 per linear foot) totaling $3,962,328.[31] However, later in his testimony, he stated that Dock 4 was designed to accommodate the transfer of aggregate or bulk material from water to the landside. Violet Port already had a permit to install a conveyer system there.
In terms of full replacement cost of the docks, Oubre admitted that he was relying on numbers provided by both Truax and Dr. Patrick C. Flower, a civil engineer, to arrive at a full replacement cost (direct and indirect) of $38,737,105 for Docks 1, 2, 4, and 5, and general site improvements before depreciation. He stated that only an engineer could determine what it would cost to reconstruct the docks. This amount also included a 10% entrepreneurial incentive of $3,521,555.[32] He further valued the administrative building at $48,000. From the full replacement cost, Oubre deducted $10,898,146 for physical incurable obsolescence[33] and $4,371,055 for functional obsolescence, *77 [34] arriving at total of $23,515,404 as the economic value of the docks or replacement cost less depreciation.
In his appraisal of December 2010, Oubre stated that, based on his analysis using an income approach, the compensation due as a result of the expropriation of the property was $16 million.[35] His determination of highest and best use was for it to continue as a marine layberth facility with topside repairs and limited bulk material. Oubre thought that the income analysis was stronger than a cost analysis because the former used relevant market data and actual revenues.
Under cross-examination, Oubre admitted that an appraisal is not based on a mathematical formula. It is an opinion of value; one has to rely on the available data and one's experience. The question then becomes, is the number realistic; is it reasonable within the market data and the parameters one knows about the market? He noted that it was just a coincidence that he and Truax arrived at the same value of $16 million; Oubre believed that the value was reasonable.
Oubre stated that the intended use of Truax's appraisal was for acquisition, not expropriation; therefore, he used a leased fee interest. Oubre's independent appraisal was of the fee simple value. Oubre agreed that he did an appraisal of the highest and best most profitable use to which the property could be put. In other words, the property is always valued from the highest and best use, its current use does not limit his determination. Contrary to his report, Oubre stated that the highest and best use of the property was "layberths, some topside repair, and some bulk cargo-bulk material." He testified that the demand for aggregate bulk cargo operations was growing and would continue to grow in the future.
David Fennelly, St. Bernard Port's next witness, was the director of Associated Terminals, a stevedoring and logistics company. Associated Terminals is a separate company that is focused on operations in St. Bernard Parish and its port. As such, it transloads cargo to and from ocean vessels, barges, trucks, and railcars, and stores cargo. It handles non-hazardous dry bulk and break-bulk cargo.
Fennelly worked with Burk-Kleinpeter, Inc. ("BKI") to prepare the 2008 PPA submitted to DOTD by St. Bernard Port. Fennelly helped prepare conceptual designs of the potential uses for the property and provided information relating to the need for the property, market demand, and projected tonnage.
Although Associated Terminals had not yet been awarded a contract by St. Bernard Port to run the Violet Port facility, it was marketing the facility to prospective users. It had a significant customer base and it had already received inquiries about the potential availability of the site. Associated Terminals had been interested in Violet Port since 2007.
Fennelly testified that a limitation of Violet Port was its proximity to a neighborhood *78 with a playgrounds and a school. As such, the site could not work with certain types of cargo, such as those producing dust and causing noise. The type of cargos excluded would include coal, petroleum coke, pig iron, and hot briquetted iron.
Overall, Fennelly stated that Associated Terminals would like to be the leaseholder and operator of the Violet Port site should the right agreement be reached. He testified that as of December 2010, the Violet Port site was adequate for a proposed terminal facility because of the following attributes: (1) access to the river; (2) on stable ground; (3) road access; (4) immediately adjacent to a Norfolk Southern track; and (5) considered "deep draft." It was his belief that the property could be developed to include solid bulk storage and a liquid bulk terminal facility in less than eight to ten years. Fennelly had already discussed with Norfolk Southern Railroad about putting trackage along the property, something in which some of the railroad's clients were interested.
St. Bernard Port's next witness was Flower, who had an undergraduate degree in civil engineering and a Ph.D. in financial economics. He was self-employed by his own company, Optimum Concept Consulting, LLC. Flower was accepted by the court as an expert in civil engineering, design and construction of marine cargo facilities, as well as replacement costs and condition analyses of same.
Flower was retained by St. Bernard Port to estimate the value of the docks currently existing at Violet Port. He did this by determining their replacement costs new and then deducted depreciation to come to a final number. Physical depreciation is based on the ratio of expected remaining useful life over useful life. To make this calculation, Flower assigned a useful life of 50 years for each dock,[36] except for Dock 3, which was quite deteriorated. Flower was asked to prepare a replacement cost for the improvements present on December 2010, less curable physical deterioration,[37] incurable physical deterioration, and functional obsolescence. He was not asked to identify any external obsolescence.[38]
Flower inspected the docks on three separate occasions: November 2010; February 2013; and August 2013. In 2010, Truax gave him blueprints of the docks. His report and testimony were based on a component by component basis and then converted to the dollars per square foot. He developed comparables to disagree with the $450 per square foot for the dock platforms and the $350 per square foot units for trestles that Violet Port's expert engineering company, Lanier & Associates Consulting Engineers ("Lanier"), had used. Instead, Flower's prices per square foot were considerably lower, ranging from $120 to $391 per square foot.
Flower testified that he arrived at unit prices per square foot using the database kept by Kinder Morgan Terminals, in whose building his office is located. Kinder Morgan is the largest solid bulk and liquid bulk terminal operator in the United *79 States, although their primary business is pipelines. Flower had a continuing relationship with its technical and developmental personnel with access to information it compiled.
Flower calculated the replacement cost and depreciated values of the docks as follows: Dock 1-replacement of $10,025,370 and depreciation of $5,361,470; Dock 2-replacement of $12,686,278 and depreciation of $6,527,378; Dock 3-replacement of $2,669,624 and depreciation of $140,671; Dock 4-replacement of $3,481,000 and depreciation of $2,530,200 (construction not completed at time of analysis); and Dock 5-replacement of $8,406,500 and depreciation of $4,369,700. Thus, according to Flower, the replacement cost of the docks totaled $37,268,772, with a total depreciated value of $18,949,419.
Flower did not give separate values for mechanical and electrical improvements. These items were included in his total replacement cost for each dock. Under "soft costs," he gave estimates for a conceptual and preliminary phase, i.e ., soil investigation, design, and permits ($266,000), final design and construction ($621,000), and interim interest for construction financing ($266,000).
Under cross examination, Flower admitted that he was accepted as a cost expert in only one case, however, he was not allowed to testify regarding replacement costs. It had been over 20 years since he had directly supervised the construction of a dock.
B. Testimony Presented by Violet Port
For its first witness, Violet Port presented engineering testimony from Joseph Emile Jacquat, who held both a B.S. and a M.S. in Civil Engineering. He was senior vice president for Lanier where he had worked for about 23 years. His engineering work has consisted of docks, wharfs, and bulkheads on marine projects for a number of companies in Louisiana and Texas, including the Port of New Orleans and the Port of Port Arthur, Texas. Lanier had also worked for St. Bernard Port in the past. Jacquat was accepted by the court as an expert in the field of engineering.
Lanier began working for Violet Port in 2000 and had worked with Violet Port off and on ever since. He had probably been to Violet Port to see the docks 12-15 times since then. While no renovations to Dock 3 were made, Lanier had performed the required renovations to Docks 1, 2, and 5, for the Navy to park its sealift vessels; Jacquat did not believe that the Navy used Dock 4. He stated that Navy specifications changed over the years so additional renovations were needed. Dock 4 was in the process of being renovated to handle aggregate bulk cargo.
In mid-July 2010, Lanier was asked by Violet Port to prepare a report on the replacement cost for both the marine and landside items on site. The goal was to determine what it would take to rebuild the various structures in 2010. To do so, a team of engineers, civil/structural, mechanical, and electrical, spent most of a week on site, taking photographs and verifying dimensions of structures, both on shore and offshore. After doing so, the team, along with Jacquat, assembled that information into tabulated values and items. For unit costs, cost data was compiled from ongoing projects at Violet Port and recent projects at other facilities on which Lanier was working.
In Jacquat's report, the replacement costs were broken down into three categories: civil/structural, mechanical, and electrical. No depreciation was applied. The total estimated marine terminal cost using replace-in-kind values are as follows: Dock *80 1-$15,656,678; Dock 2-$22,030,156; Dock 3-$6,095,168; Dock 4-$6,308,950; Dock 5-$10,244,672; General Facility-$5,091,341; and Equipment/Mechanical-$3,571,881. Because Violet Port was "robustly designed and well-constructed, [was] well maintained and experienced relatively low repetitive wear, it was reasonable to expect that a useful life of the facility will be 60 years or more." The report also stated that the facility had an average of 70% to 80% remaining service life and with continued proper maintenance, a useful life of 60 years could be achieved.
On cross-examination, Jacquat admitted that his team did not perform an inspection of the docks in 2010. The approximate $68 million replacement cost was based on a unit cost per square foot for the trestle and the apron and the other features that were at the facility. The unit price used for the dock aprons of Docks 1, 2, 4, and 5 was $450 per square foot and the unit price for the trestle of all five docks was $350 per square foot. The prices per dock did not vary. He used prices from comparable projects in the office; he spoke to project managers and pulled out the costing information from recent bids. Jacquat conceded that each dock was designed differently and had different numbers and sizes of piles with different wall thickness.
Violet Port's next witness was Randolph Carmichael, an urban planner. His career has focused on economic development. He began working at BKI in 1980. Shortly after joining the firm, Carmichael was assigned to the St. Bernard Port, which was created in 1981. St. Bernard Port was one of the firm's clients; he worked with St. Bernard Port until his retirement in June 2011.
Carmichael helped prepare the 2008 PPA for the Violet Port site on behalf of St. Bernard Port. The proposed use was a multi-purpose terminal for the movement of solid and liquid bulk products. It took him months to prepare the application; BKI engineers assisted him. He also met with Associated Terminals two or three times to explore the site's possibilities.
The attributes of the Violet Port site that made it suitable for its proposed use included: (1) 4000 or more feet on a relatively straight section of the river; (2) deep water access; (3) some existing docks could be used relatively quickly; (4) access to road and rail; (5) a favorable steerage channel; (6) utilities, i.e ., water, gas, electrical, telephone, and sewerage; (7) heavy industrial zoning; (8) ability to berth some of the largest cargo ships in the world; and (9) fenced secure areas with paved parking.
Carmichael also noted in the 2008 PPA that substantial commercial utility was found in the upland 38 acres and 22 acres of batture. It stated that "a strategic analysis led to the conclusion that the site best [highest and best use] leant itself to the transfer and storage of solid and liquid bulk commodities." In reaching this conclusion, the application stated that the site was unique. The built drawings obtained from Lanier revealed that the docks had a live load design of 450 pounds per square foot, but that mats placed under cranes could further increase the load capacity in a cost-effective manner. The application also stated that the docks were personally inspected by a BKI engineer who indicated that the docks and ramps appeared to be structurally sound and in good shape. Carmichael also agreed that a number of physical improvements would be needed at the Violet Port site and that the application presented a phased development of the property that could take a number of years.
Carmichael also prepared and signed the 2009 Supplemental Report. The purpose of the supplemental report was to *81 provide additional information after he met with two representatives from the Port Priority Program. With regard to the Navy leases, the St. Bernard Port stated that it would continue to service the existing ones and compete for additional contracts.
Heyward M. Cantrell, a certified general appraiser, was the next witness presented by Violet Port. He had been an appraiser for over 40 years and owned his own company, Cantrell Real Estate. He was accepted by the district court as an expert in real estate appraisal.
Cantrell was hired by Violet Port to perform an appraisal of the property and improvements as of December 22, 2010. He testified that he had considerable experience appraising port properties in Louisiana and Florida. He determined that the highest and best use of the property was continued layberthing along with a bulk commodities terminal.[39] He recognized that the conceptual drawings by St. Bernard Port also included a liquid commodities terminal, but did not include that in his highest and best use determination.
Cantrell's highest and best use analysis looked at the property as both vacant and improved and as physically possible, legally permissible, financially feasible, and maximally productive. He concluded that the highest and best use of the batture as vacant was for dockage of deep water vessels engaged in international shipping of bulk commodities.
Applying the same type of analysis to the upland, he determined that the highest and best use as vacant was for the storage of solid bulk and nonhazardous liquid bulk commodities brought to and from the site on deep draft vessels and barges as well as railroad and highway transportation. As improved, he found that Dock 2, under a long-term lease with the Navy, should continue as such. However, he thought the remaining property would be best served by transitioning into bulk commodities storage with highway and railroad access. This conclusion was confirmed by an agreement to lease the property by Vulcan dated March 12, 2010. This was an option agreement that would allow Vulcan to lease portions of the property as an aggregate distribution facility.
Cantrell stated that total for land and depreciated improvements was $50,926,443.[40] The amount of $8,211,000 was the total of his estimate of the land ($3,860,000 as rounded), the batture ($4,200,000), and Plot Y ($151,000).[41] Cantrell included "indirect costs" of permitting and other legal expenses ($500,000), construction financing interest ($2,208,160), and construction financing costs ($981,404).
He used a replacement cost approach method with regard to the property's improvements and arrived at $76,028,182 before depreciation. Cantrell then applied a rate of depreciation based on the age and construction of the dock, using a useful life of 60 years.[42] As for the cost of the docks, *82 Cantrell adopted the numbers as determined by Lanier. Cantrell admitted that he submitted a revised report lowering the value of Plot Y after he obtained new zoning information from St. Bernard Parish authorities.
Cantrell included 10 percent for entrepreneurial incentive ($6,911,653);[43] he was the only appraiser who did. Both Truax and Oubre said no market evidence existed that someone would pay a premium for the property. However, looking at a brand new facility (full replacement costs), Cantrell stated that a buyer would be willing to pay a bonus to receive a facility that it would neither have to develop nor build what is already there.
Cantrell also increased his calculation of depreciation from $18,216,764 to $33,312,740 based on Oubre's review of his report and additional information from the owners of Violet Port. These two changes decreased his original appraisal by $15,000,000. Cantrell believed that this different methodology better reflected the market than his initial analysis. Thus, his depreciated value of the docks was $50,993,000.
Cantrell made two "extraordinary assumptions" when determining the highest and best use of the property in order to value it correctly; these were identified in his revised report. To make an extraordinary assumption, one must have a reasonable basis for the assumption of an unknown fact.
One assumption was that the depth of the water was 50-60 feet; he relied on information from the owners, but did not independently check the depth. He acknowledged that soundings performed by the Corp of Engineers published in 2003 indicated a depth of 45 feet. Cantrell did not know if that depth was correct in 2010. Cantrell stated that a depth of 45 feet would not change his calculation of value.
The other assumption was that the Corp of Engineers and/or the Levee District of St. Bernard Parish would issue the requisite permits to allow solid bulk and nonhazardous liquid material to be transported over the levee. He spoke with St. Bernard Parish to learn that the upland area could be used to store products and materials, assuming that the materials were nonhazardous.
In coming to the conclusion that the highest and best use of the property is bulk cargo operations, Cantrell noted that Vulcan, one of the largest aggregate dealers in the world, was highly interested in an agreement to locate at Violet Port. It certainly was why St. Bernard Port wanted the property. Therefore, the proposed use for the property was neither speculative nor unreasonable.
The next witness was Daniel Dieudonne, one of the owners of Violet Port. He began working at Violet Port in the early 1990's. Before that, his father ran the day-to-day operations. At the time of the quick-taking, Dieudonne was the president and general manager. He testified that Violet Port was involved in various projects such as, topside and some bottom-side repairs, bid on government contracts, and some cargo operations. He also described the layberthing services being provided to the Navy, something Violet Port had been doing for many years.
In December 2010, Violet Port was actively renovating and updating Dock 4 in anticipation of signing a lease with Vulcan to start handling increasing amounts of *83 aggregate bulk cargo. All renovations and updates ceased upon the quick-taking.
Violet Port also presented the testimony of Dr. Wade Ragas, an appraiser with a Ph.D. in finance. The court accepted Ragas as an expert in real estate appraisal. Ragas prepared an initial report. However, after reviewing the appraisals by Truax and Oubre, he revised his estimates. Ragas acknowledged that this was a complicated appraisal assignment and that experts' opinions could differ about many of its components.
In performing his job, Ragas visited the site at least six times. To begin a valuation of the land, batture, and Plot Y, he was required to arrive at the highest and best use of the property. In his revised report dated January 30, 2013, he stated in pertinent part:
Violet Dock is a special purpose property best suited for multiple bulk cargo (dry and liquid) plus existing contracts with the U.S. Navy MSC for layberth and servicing of large, medium-speed roll-on/roll-off Navy cargo ships (contract to 2018)[.][44]
After issuing his initial report, Ragas found five different matters he wanted to reevaluate. The first had to do with nonlinear depreciation. He decided that more depreciation was warranted than what he had originally taken. In this regard, he consulted again with the engineers. The second issue was that of the effective age being used by St. Bernard Port's appraisers. The third issue was the measure of width in one of the comparables used. He could not get a survey performed, so Ragas used 1,660 feet in width at the water line; this altered the price per foot.
The fourth issue had to do with the fact that no appraiser had submitted any comparable sales commensurate with the existing docks. As a result, he allowed for a 10% bulk sale discount and deducted that from his total valuation. Finally, he understood that water depth was a matter of dispute when earlier he thought it was not. While he changed his report to reflect an average depth of 45 feet from the 50-60 feet he was originally told, it did not affect his total valuation of $51,500,000. This amount represented a depreciated amount of the docks and site improvements, his values for the land and batture, less the bulk sale discount.
Ragas testified that he first looked to as much information he could gather about market conditions and demand for facilities that might include docks. He came to the conclusion that he was dealing with a bulk cargo-type property; that such use was likely. He used the engineering expertise of Lanier believing that it was a reasonable expert on this property and other maritime facilities.
Ragas then searched comparables and used those that he thought were most appropriate, although he admitted that none were on point. In this way, he came to the conclusion that the indicated value of the batture at about four and one-half million. Next, he looked at the upland and tried to ascertain landside industrial uses.
As did other appraisers, Ragas analyzed the highest and best use of the property both as vacant and improved. He stated that the vacant site's best use was as "a multimodal import and export bulk cargo dry and liquids shipping site particularly *84 well suited for 900 foot or longer ships with a beam up to 160 feet. The site can also support topside repair berths and numerous configurations of barge tow berthing." As improved, the site's highest and best use would be for general bulk cargo transfer, topside repair, layberth and specialized cargo facilities and aggregate bulk transfer. Of course, the site would continue to dock and layberth the Navy ships pursuant to the lease currently in place.
In arriving at his numbers, Ragas followed generally accepted appraisal principles. Normally one uses comparables to value land, but none seemed to be available. He stated that the same issue arose for all the appraisers. He believed that an income approach to value would be inappropriate for this property; he used a cost analysis. As he interpreted their reports, all the appraisers agreed that Violet Port was a special-use property.
Violet Port's next witness was Paul Simmons, president and general manager of Boland Marine and Industrial ("Boland"). He also became a shareholder of Violet Port in 2009 and sits on its Board of Directors.
Before the quick-taking, Violet Port was in the business of providing berthing for vessels, ship repairs, and some cargo operations. In the year or two preceding the taking, Violet Port was expanding its docks and looking into increasing its cargo business. Immediately before the taking, Violet Port was poised to enter into a contract with Vulcan to provide Dock 4 as an aggregate terminal. To accomplish this, improvement efforts were focused on Dock 4 and the necessary permits had been obtained.
Simmons testified that it would have cost millions of dollars to relocate in order to continue to service the Navy's ships as it had done so for many years. Although Violet Port looked, it found no available sites that would meet the Navy's specifications.
Violet Port recalled Scafidel, St. Bernard Port's Executive Director, to the stand. He was familiar with the document entitled, "Dock Rehabilitation Industrial Renewal and Expansion of Facilities Status Report on Ongoing Projects," prepared by St. Bernard Port in March 2006. St. Bernard Port referred to the Violet Port site as one of the last major properties on the Mississippi River suitable for cargo trans-shipping. In November 2008, it claimed that Violet Port was the only remaining site in St. Bernard that could be a deep draft marine terminal.
C. Rebuttal Testimony by St. Bernard Port
St. Bernard Port presented two of their appraisers as rebuttal witnesses after Violet Port rested its case: engineer Truax, and appraiser Oubre. Both were questioned about the conclusions by appraiser Ragas; Oubre was also questioned about appraiser Cantrell's reports and testimony.
In summary, Truax criticized Ragas' report in many respects, including: (1) his batture value was too high; (2) Ragas claimed to have used Truax's numbers to conform his valuation but did not property utilize Truax's allocations; and (3) Ragas did not use the entirety of Truax's report, but instead picked and chose information to support his conclusions. Truax also testified that the Violet Port site was not unique, he properly valued the entire site at $16 million, and that other properties existing on the Mississippi River could be modified at or less than that amount to service the Navy contracts.
On cross-examination, Truax admitted that he neither used any of the information contained in St. Bernard Port's 2008 PPA to acquire the Violet Port site nor utilized the reports by Oubre and engineer Flower.
*85 Oubre testified that he prepared appraisal reviews of the appraisals by Cantrell and Ragas and found them not to be credible for a number of reasons.
With regard to Ragas, Oubre stated that he did not believe that the appraisal satisfied the intended use. He also stated that the report included personal business property, which was inappropriate. Oubre found that Ragas made several assumptions that he would consider "extraordinary." These are assumptions that are unknown but presumed to be true. These must be necessary to achieve a credible value appropriate of the intended use; have a reasonable basis; and result in a credible analysis and value opinion. These extraordinary assumptions are: St. Bernard Parish would issue the necessary permits for intensive bulk cargo operations; the Corp of Engineers would likewise issue the requisite permits for solid and/or liquid cargo operations at docks other than Dock 4; the water depth was at least 45 feet; the Mississippi River would dredge to 50 feet; and that the docks were strong enough to berth fully-laden cargo vessels and intensive cargo loading and offloading.
He also stated that Ragas did not adjust his values by functional obsolescence; his valuation is based on new constructs rather than on market value estimates, thus, his estimate of $73 million new without depreciation was not credible. Ragas based his valuation on future uses of the property, not on the activities at the time of expropriation.
With regard to Cantrell's appraisals, Oubre noted that valuation in his initial report was between $63-$64 million, his revised report gave a valuation of about $51 million, and testified that the value was about $40 million. As for extraordinary assumptions, Cantrell's were similar to those made by Ragas.
Under cross-examination, Oubre agreed that all appraisals are opinions and judgment calls. He also agreed that an appraisal review is also an opinion; it is not an opinion of whether another's conclusions are correct or incorrect. He noted that appraisers often differ on market values and choice of comparable sales.
Oubre stated that Truax offered a cost analysis based on the reproduction of docks of similar functional utility. Oubre considered Truax sufficiently capable of preparing his report.
IV. DISCUSSION
As stated by the Louisiana Supreme Court, where one or more legal errors by the lower court interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent de novo review of the record and determine an award by a preponderance of the evidence. McLean v. Hunter, 495 So.2d 1298, 1304 (La.1986) ; Picou v. Ferrara, 483 So.2d 915, 918 (La.1986) ; Suhor v. Gusse, 388 So.2d 755, 758 (La.1980) and cases cited therein. "Proof by a preponderance of the evidence simply means that taking the evidence as a whole, such proof shows that the fact or cause sought to be proved is more probable than not." Crescent City Cabinets & Flooring, L.L.C. v. Grace Tama Develop. Co., L.L.C. , 16-0359, p. 9 (La.App. 4 Cir. 10/19/16), 203 So.3d 408, 414.
Throughout this remand, St. Bernard Port asserts that we are bound by the factual conclusions made by the district court, such as the land's "highest and best use" and credibility determinations regarding the expert witnesses. It is mistaken. This is a de novo review based on the evidence in the record, and we are charged with determining an award of damages under a preponderance of the evidence *86 standard. In other words, we are performing the duties normally undertaken by a district court. The Supreme Court remanded this case "solely for the purpose of fixing the amount of just compensation based on the evidence in the record," St. Bernard Port , 17-0434, pp. 16-17, 239 So.3d at 255, and, therefore, the issue of the constitutionality of the taking was decided; in other words, we are not free to revisit that issue.
A. Docks and Other Site Improvements
With respect to the amount of full replacement costs of Violet Port's improvements,[45] I find St. Bernard Port's engineers' amounts not to be determinative but useful.[46] Flower's full replacement cost without depreciation totaled $37,268,772, and Truax's full replacement cost without depreciation totaled $31,245,980. I find that a reasonable full replacement cost for Violet Port's improvements to be $29 million based on a totality of circumstances analysis and recognizing that there is a margin of error inherent in the determination of the ultimate replacement cost of improvements due the nature of the competitive bidding process.
I now address the majority's ruling that Violet Port should not receive full replacement cost but a depreciated replacement cost of the improvements. I find this is clearly contrary to the "full compensation" language in the Constitution[47] and Constant.[48] The majority's deduction of the *87 depreciation amount of $12,466,087 is a legal error and results in Violet Port receiving less than its full loss as mandated by La. Const. Art. I, § 4 (B)(5) and in accordance with the Louisiana Supreme Court's interpretation of La. Const. Art. I, § 4 (B)(5).[49]
A property owner is entitled to just compensation to the "full extent of his loss," which "shall include, but not be limited to, the appraised value of the property and all costs of relocation, inconvenience, and any other damages actually incurred because of the expropriation." La. Const. Art. I, § 4 (B)(5).[50] The phrase "full extent of the loss" means that the owner must "not only be paid the market value of property taken...but also that such an owner be put in as good a position pecuniarily as he would have been had his property not been taken." Constant, 369 So.2d at 701. The fact that a just compensation award may exceed the market value of the property taken is "not constitutionally significant." Id. at 702 ; see also Dietrich, 555 So.2d at 1358 ( Article I, § 4 permits compensation in excess of market value because "the landowner should be compensated for 'his loss' not merely the loss of the land.").
In 1974, the Louisiana Constitution was re-worded to provide that an "owner shall be compensated to the full extent of his loss" when land is expropriated by the state. Previously, a property owner could only receive the fair market value and any severance damages for property taken through expropriation. The change permitted a property owner to remain in an equivalent financial position to that which he enjoyed before the taking. See generally, State Through Dep't of Highways v. Bitterwolf, 415 So.2d 196 (La. 1982)
The Constant Court examined the changes made to Article 1, § 4 in the 1974 Constitution:
We have considered in detail the delegates' discussion of amendments to proposed Article 1, Section 4, as submitted to the Constitutional Convention by the committee which drafted the provision.
*88 Numerous amendments were offered when the Committee provision came before the convention for adoption; virtually all proffered amendments were rejected and the committee's submitted version adopted with no significant change. The arguments posed in opposition to proposed amendments make it clear beyond doubt that the intent of the submitted Article was to enlarge, liberalize, and expand the scope of the "just and adequate compensation" measure of damages contained in the Constitution of 1921, by inclusion of the phrase "the owner shall be compensated to the full extent of his loss" so that his award for property value and severance damages would not be eroded to the extent of such expenses incurred by him in litigating the damages due.
***
In this regard, we note the committee comment appearing in the Records of the Louisiana Constitutional Convention of 1973, Convention Transcript, Volume I, 11th day proceedings, July 6, 1973, page 86, to the effect that "The term 'full extent of the loss' is intended to permit an owner whose property has been taken to remain in equivalent financial circumstances after the taking".
The explanation of Delegate Lanier, when the article was before the convention for final adoption, indicates that the provision "full extent of the loss" was meant to cover elements of damage formerly considered damnum absque injuria, such as costs of removal and similar costs. Records of the Louisiana Constitutional Convention of 1973, Convention Transcript VII 46th days proceedings, September 13, 1973, pages 1240-1242.
***
Professor Hargrave aptly noted:
"No doubt this provision will spawn much litigation, but it is clear that the level of expropriation awards must be expanded to include moving expenses, business losses because of change of location and compensation for some intangible losses not covered under prior law."
We find no merit in the Department's argument that the hereinabove mentioned legislation adopted subsequent to the effective date of La.Const. 1974, Article 1, Section 4, shows intent to retain the former measure of compensation due for expropriated property. In determining constitutionality, legislation may be persuasive but is never controlling upon the courts. The function of interpreting the constitution and laws of the state, in final analysis, rests exclusively upon the courts. La.Const.1974, Article 5, Section 1.
Id. , 359 So.2d at 671-72. (Emphasis added.)[51]
*89 In Constant, the state highway department expropriated certain property of the defendants in order to construct a new bridge and the highway approaches to it. The property taken consisted of the marina business' loading dock and parking area. The award by the district court represented the replacement cost of the facility taken without depreciation. The Supreme Court noted that the taking had essentially destroyed the business on the entire parent tract.
The Court framed the "essential issue" before it:
Under the new constitutional provision that "the owner shall be compensated to the full extent of his loss", La.Const. of 1974, Art. 1, Section 4, may the award to the defendant owners be sufficient to restore their business facilities to their condition prior to the taking, even though the amount so required is in excess of the market value of the parent tract from which a portion is taken for highway purposes?
We answer this question in the affirmative, for the reasons below to be stated.
Id. at 701.
The Court found that under the "new constitutional provision," and considering the property was unique and indispensable to their business, the property owners were entitled for the direct and indirect costs of constructing a replacement loading area and improvements on the loading strip plus the value of the land upon which the replacement loading area would be constructed. Id. at 707.
Despite St. Bernard Port's protestations to the contrary, the majority correctly finds that the improvements in question were unique and indispensable to Violet Port's business; the record is replete with evidence supporting this finding. As recognized by the majority, Violet Port's business ceased to exist when the property was taken. St. Bernard Port admits to the uniqueness of the property for purposes to expand its bulk cargo business. Its own expert, Oubre, on whom the majority relies to support its award, stated that the property was unique; a " 'special use property' with highly specialized improvements." St. Bernard Port concedes that the Violet Port property was the "only piece of property in the entire parish, along the Mississippi River that could serve as a deep draft marine terminal." Consequently, the law provides that Violet Port is entitled to full replacement value as an award from this court.
This conclusion is further supported by the majority's finding that the facility and business operations were highly specialized. Many improvements were made on the property so it could service Navy *90 ocean-going ships, including installing transformers, a potable water supply, six telephone lines per ship, and a boiler for steam. In addition to the mechanical and electrical support for the ships, numerous landside improvements were performed to comply with Navy specifications.
Just compensation for the taking of property that is "both unique in nature and location and also indispensable to the conduct of the property owners' business operations" is the full replacement costs of the improvements without a depreciation deduction.[52] Constant, 369 So.2d at 706 ; see also Orleans Parish Sch. Bd. v. State, Div. Of Admin., 12-1312, p. 5 (La. App. 4 Cir. 2/27/13), 177 So.3d 711, 713, writ denied, 13-0683 (La. 5/3/13), 113 So.3d 216 (a property owner is "entitled" to recover replacement costs "upon a showing that the location of the property or some physical feature of it is unique and indispensably related to the success of the business"). An award of replacement costs recognizes that market value is not a proper measure of just compensation when (as in the present case) "there is an absence of sales of similar properties." Id., 12-1312, p. 4, 177 So.3d at 713.
In State, Dep't of Transp. and Dev. v. Hecker , 493 So. 2d 125, 129 (La.App. 5th Cir. 1986), the court awarded full replacement costs without deducting depreciation:
We find that the defendants are correct in maintaining that they are entitled to recover the replacement cost without deduction for depreciation. The factual situation here is very much like the facts of the Constant case, supra, and of Monroe Redevelopment Agency v. Succession of Kusin, 398 So.2d 1159 (La.App. 2nd Cir.1981). Both those cases involved partial taking, but the courts found that the property expropriated was unique and indispensable to the occupants' continuing in business.[53]
*91 To demonstrate "uniqueness," one need not prove that the property is one of a kind or that its improvements cannot be replicated elsewhere. Rather, "unique" properties are simply those located, designed, and tailored to serve a particular business' needs. For example, in Constant, just compensation included replacement costs of a marina loading dock and underlying land necessary for the marina's business. 369 So.2d at 706. Likewise, in State ex rel. Dep't of Transp. and Dev. v. Wade, 07-1385 (La. App. 3 Cir. 5/28/08), 984 So.2d 918, writ denied, 08-1896 (La. 12/12/08), 997 So.2d 561, the court awarded replacement costs for a farm equipment supply business, finding that its showroom, warehouse, and outdoor storage areas were "designed to fit the specific business plan" of the business. Id. , 07-1385, p. 7, 984 So.2d at 923.
Property is "indispensable" to a business when the expropriation of the property causes the business thereon to be "destroyed, or at least affected to a substantially detrimental extent." State, Dep't of Transp. and Dev. v. Lobel, 571 So.2d 742, 744-45 (La. App. 2 Cir. 1990). Under those circumstances, the "uniqueness and indispensability of the expropriated property would render it more valuable to the property owner than it would be to the average buyer. In such a case, the market value of the property would inadequately compensate the defendant and, based on his unique, indispensable need for the property, would place the defendant in a worse pecuniary position than he had been in before the taking." State, Dep't of Transp. and Dev. v. Griffith, 585 So.2d 629, 632 (La. App. 2 Cir. 1991), writ denied, 589 So.2d 1055 (La. 1991) ; see also Wade, 07-1385, p. 6, 984 So.2d at 923. An award of replacement costs is proper, even if the business does not in fact relocate because, for example, it cannot locate replacement property or because "the high cost of the [replacement] land together with the added construction costs ma[ke] relocation cost-prohibitive." State v. G & B Oil Prod., Inc., 99-1248, p. 6 (La. App. 3 Cir. 6/21/00), 762 So.2d 1123, 1127, writ denied , 00-2196 (La. 10/27/00), 772 So.2d 649. No "prerequisite" exists that the replacement improvements actually be built. Polk v. State, through Dep't of Transp. and Dev., 538 So.2d 239, 254 (La. 1989) ; State v. Latiolais, 95-1441, p.9 (La. App. 3 Cir. 11/6/96), 690 So.2d 66, 71, writs denied , 97-0138, 97-0169 (La. 4/25/97), 692 So.2d 1082 (awarding full replacement costs without depreciation while finding "no requirement that the Latiolaises actually construct a new facility").
Even where the property's improvements are not in fact new, where, as here, the property's improvements are "structurally sound, with no functional obsolescence," a replacement-costs award should not include any deduction for depreciation. City of Shreveport v. Standard Printing Co. of Shreveport, Inc., 427 So.2d 1304, 1308 (La. Ct. App.), writ denied, 434 So. 2d 1106 (La. 1983), and writ granted, 435 So. 2d 426 (La. 1983), writ recalled, 441 So.2d 737 (La. 1983) ; Constant, 369 So.2d at 706 (district court erred in deducting for depreciation because, "more probably than not, despite its theoretical 30-year life expectancy, the expropriated loading strip at the end of thirty years would have still been as serviceable to them as on the date of taking").[54]
Thus, full replacement costs in the case sub judice is the amount of money necessary for Violet Port to replace the docks *92 and other site improvements plus the price to purchase a comparable piece of property on which the improvements could be installed, as St. Bernard Port argues Violet Port could have done.[55] And because the property is "unique and indispensable," I find that the majority erroneously applied depreciation to the improvements.
B. Upland, Plot Y, and Batture
As stated above, I agree with the majority opinion in its application of the cost method of appraisal, which bifurcates the valuation of improvements and land by first valuing the replacement cost of the improvements and then valuing the land and batture. The record demonstrates that the two experts for St. Bernard Port (Oubre and Truax) and the two experts for Violet Port (Cantrell and Ragas) testified as to the value of the land and batture. The upland and Plot Y were valued per square foot ("SF") and the batture was valued per linear foot ("LF").[56] All experts valued the land and batture separately by considering market value estimates, which were predicated upon prices paid in actual market transactions and current listings, i.e. comparable sales. They also adjusted these comparables based on their opinions as to attributes of the land and batture, any good or bad assumptions associated with the land and batture, and the "highest and best use" of the land and batture. Oubre and Truax placed a low value on the land and batture, determining values of $3,962,000 and $4,580,000, respectively; whereas, Cantrell and Ragas placed values of $8,211,000 and $11,470,000, respectively.
In essence this was a battle of the experts on their valuations based on an analysis of attributes, assumptions, and usages associated with the land and batture. Thus, this valuation analysis becomes a totality of the circumstances review. After reviewing the evidence, I find Oubre's valuation of the land and batture, as used by the majority, to be inadequate and his "highest and best use" analysis confusing.[57] I find *93 error with the majority's reliance on Oubre.[58] I find Cantrell's value of the upland at $3,857,435 and Ragas' value of the batture at $5,125,000 to be the most reflective of the many great attributes associated with the upland and batture, which allowed for the "highest and best use" of property to be multi-modal bulk cargo operations that could be undertaken in the "not too distant future."[59] I accept Truax's value of $35,565 for Plot Y.[60]
"Fair market value," has consistently been defined as "the price a buyer is willing to pay after considering all of the uses that the property may be put to where such uses are not speculative, remote or contrary to law." W. Jefferson Levee Dist. v. Coast Quality Constr. Corp., 93-1718 (La. 5/23/94), 640 So.2d 1258, 1273, cert. denied, 513 U.S. 1083, 115 S.Ct. 736, 130 L.Ed.2d 639 (1995). In determining the fair market value of land taken in an expropriation case, consideration is to be given to the most profitable use to which the land can be put by reason of its location, topography, and adaptability, also known as the "highest and best use" doctrine. Exxon Pipeline, 00-2535, 00-2559, p. 8, 788 So.2d at 1160. Factors to be considered in determining the "highest and best use" of the taken land and batture include: (1) market demand; (2) proximity to areas already developed in a compatible manner with the intended use;[61] (3) economic development *94 in the area; (4) specific plans of business and individuals, including action already taken to develop the land for that use; (5) scarcity of the land available for that use; (6) negotiations with buyers interested in the property taken for a particular use; (7) absence of offers to buy the property made by the buyers who put it to the use urged; and (8) the use to which the property was being put at the time of the taking. Id., 00-2535, 00-2559, pp. 8-9, 788 So.2d at 1160. On remand, the Supreme Court instructed that a determination as to "highest and best use" of the property at the time of the quick-taking requires a review of testimony as to whether Violet Port demonstrated, by a preponderance of the evidence, that the property could be used in a different, more valuable way, that the potential use is not speculative, and that it could be undertaken in the "not too distant future." St. Bernard Port, 17-0434, p. 14, 239 So.3d at 254, quoting W. Jefferson Levee Dist., 93-1718, 640 So.2d at 1273.
The current use of the property is presumed to be the "highest and best use," and the property owner bears the burden of proving the existence of a different "highest and best use" based on a potential, future use. Id. While a property owner is entitled to compensation based on a potential use of the property even though the property is not being so utilized at the time of the taking, he must show that "it is reasonably probable that the property could be put to this use in the not too distant future, absent the expropriation and project for which the land was expropriated, and provided such a use would have an effect on the price a buyer is willing to pay." W. Jefferson Levee Dist., 640 So.2d at 1273. If the property owner demonstrates that the potential future use is within the reasonably near future, he is entitled to compensation on the basis of such use, notwithstanding the property is not being utilized for such use at the time of the taking. Id.
Although the experts seem to agree on the unique and extraordinary attributes of the land and batture, which would allow for multi-modal cargo operations, Ragas and Cantrell were the only experts who gave these attributes great weight and applied these attributes to his valuations. All experts struggled to find comparable sales due to the unique attributes of Violet Port's land and batture. However, the experts all agree that the land and batture, without taking into consideration the improvements, and looking at it as vacant land, have the following two extraordinary unique attributes: (1) direct access to river, road, and rail transportation and all utilities and (2) one mile (4,200 LF) of relatively straight batture on the Mississippi River, which is deep-water, self-scouring, and totals approximately 22 acres outside the levee. The experts also agree that access to river and road transportation is necessary for the use of layberthing and topside ship repairs and that access to river, road, and rail transportation is necessary for the use of the property for solid and liquid bulk cargo operations. The property's access to all types of utilities was necessary for all types of usage.
The majority's opinion correctly lays out a description of Violet Port's property with respect to the various mechanical and electrical support and public utilities available in the neighborhood adjoining or on the site included electricity, water, natural gas, telephone, and sanitary sewer. What the majority omits, however, are the many unique locational and physical attributes of the land and batture. These include: (1) over 4,200 LF of straight batture of near 45 or more feet in water depth; (2) self-scouring water depth; (4) location within a four-hour sail of the mouth of the Mississippi River; (5) location across from anchorage *95 and at a river width with suitable use as a turning basin; and (6) the site was zoned I-2 Heavy Industrial District, a liberal zoning classification that would permit general industrial, warehouse, and storage, including certain open or enclosed storage of products, materials, and vehicles. These attributes among others are what attracted St. Bernard Port to the Violet Port site in the first place.
Moreover, all the experts recognized the unique attributes of the batture. I find that St. Bernard Port's experts fail to properly value the batture in accordance with these attributes and its obvious scarcity. Even St. Bernard Port admitted that this is the only piece of property on the river that was suitable for its immediate and future plans. Thus, I accepted Ragas' value of the batture.
With respect to assumptions made by the experts, I do not place great weight on Oubre's criticism of Ragas' valuation of the batture. Oubre was concerned in what he called "extraordinary assumptions" made by Ragas when arriving at his determination of "highest and best use." First, Oubre questioned the assumption that St. Bernard Parish would issue the requisite permits for intensive bulk operations. However, Cantrell testified that he spoke with parish personnel who indicated that the upland could be used to store products and non-hazardous materials. Next, Oubre questioned Ragas' assumption that the water depth was at least 45 feet. Evidence in the record supports Ragas' conclusion. Oubre's criticism that the Mississippi River would dredge to 50 feet was again a concern unsupported by the record. Fennelly of Associated Terminals testified that one of the attributes of the Violet Port site was that it was "deep draft." Finally, I find Cantrell's assumptions as to the land reasonable and consistent with St. Bernard Port's experts.
With respect to "highest and best use," the district court found that the property's "highest and best use" was for layberthing with limited cargo operations.[62] Normally, this finding is reviewed under the manifest error standard. However, upon remand, we are reviewing the record de novo and making a determination based on the preponderance of the evidence in the record.
The record reflects that the testimony of urban planner, Carmichael, who helped prepare the 2008 PPA for the Violet Port site on behalf of St. Bernard Port, and the 2008 PPA revealed that "a strategic analysis led to the conclusion that the site best [highest and best use] leant itself to the transfer and storage of solid and liquid bulk commodities."[63] I find that St. Bernard Port cannot, in good faith, argue that the site's "highest and best use" is something less than what it stated in its application.
It is highly important to again quote St. Bernard Port in its evaluation of the Property before the quick-taking in 2010 and why it wanted this particular piece of land. In 2008, the St. Bernard Port recognized that "[l]and on the Mississippi River is finite and already limited. Greenfield sites along the Mississippi River should be considered a national asset for transportation and manufacturing (i.e., the Violet site.)" In its 2008 PPA, St. Bernard Port noted that the Violet Port site would allow it to expand its storage of solid bulk cargo on the ground, in rail cars, and in barges immediately. In the 2009 Supplemental Report, St. Bernard Port noted that "shippers frequently have the desire to *96 transfer cargo to rail or truck, both of which are possible at the Violet docks."
The law is clear that St. Bernard Port cannot now argue that the "highest and best use" of the property is layberthing, a position that "flies in the face of its prior public position" made a part of the record. Natchitoches Parish Port Comm'n v. Deblieux & Kellye, Inc., 99-313, p. 23 (La.App. 3 Cir. 3/22/00), 760 So.2d 393, 407, writ denied , 00-1121 (La. 6/2/00), 763 So.2d 601. In Bd. of Com'rs of the Port of New Orleans v. Lomm, 220 So.2d 489, 492 (La.App. 4th Cir. 1969), this court rejected the Board of Commissioners' argument that the taken property must be valued "as it is" and not based on its intended use. Therein we stated:
Mr. Frilot [one of the landowner's appraisers] considers what has already taken place in that locality as clearly indicative of greater future activity and development to be reflected in property values. He quotes from the book entitled 'Appraisal of Real Estate' published by the American Institute of Real Estate Appraisers, page 41 (4th Edition), as follows:
"The principle of anticipation affirms that value is created by anticipated benefits to be derived in the future. It is not the past but the future which is important in estimating value * * *."
and at page 25 as follows:
"Change is ever present, irresistibly affecting individual properties, neighborhoods and cities. * * * The appraiser must always view real property and its environments with the law of change uppermost in mind. * * * For it is the future, not the past, which is of prime importance in estimating value." (Emphasis added.)
Therefore, based on the evidence in the record before us, I find the amount of $9,017,803 more probably than not reflects the full compensation owed to Violet Port for the quick-taking of its upland, Plot Y, and batture.
V. CONCLUSION
Based on my de novo review of the record, I would award Violet Port the following: (1) the deficient amount of $22,017,803, pursuant to La. Const. Art. I, § 4 (B)(5) and La. R.S. 19:156 ; (2) interest on this deficient amount from the date of the quick-taking, December 22, 2010, to date of final payment; and (3) reasonable attorney's fees. I would amend the December 1, 2015 district court's judgment accordingly and affirm and remand the case to the district court for a determination of interest and attorney's fees.
For the reasons that follow, I disagree with the foundation of the majority's conclusion that the "highest and best use" of the Property is for layberthing, rather than use as a multimodal bulk cargo facility. This decision, obviously, greatly impacts the valuation of the Property. My concern is not necessarily about the result reached on that issue, but about the shortfalls in reaching that result.
On writ of certiorari , the Supreme Court found that the trial court legally erred by using the incorrect standard for evaluation of the experts' valuation testimony, where it decided that it did not have the discretion to arrive at a valuation somewhere "in between" the two expert opinions, i.e., "split the baby." St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc. , 17-0434, p. 15 (La. 1/30/18), 239 So.3d 243, 254. According to the Supreme Court, a trier of fact is not required to make a binary choice and accept one side's testimony in its entirety, *97 but is instead empowered to weigh strengths and weaknesses of expert testimony. Id. The Court also found that the trial court compounded this error by failing to identify the error and conduct a de novo review. Id.
The Supreme Court reversed and remanded the matter to this court solely for the purpose of fixing the amount of just compensation based on the evidence in the entire record and in accordance with the principles set forth in its opinion. In its remand, the Court stated "we prefer that the Court of Appeal perform the first appellate review of the entire record under the correct rule of law." Id. , 17-0434. p. 16, 239 So.3d at 255. For the reasons outlined below, I find the majority does not accomplish this directive.
In State v. Bitterwolf, 415 So.2d 196 (La. 1982), the Supreme Court explained that the legislature and the courts have developed rules which accept the fair market value of the property as a relevant consideration in determining just compensation for purposes of expropriation. Fair market value has consistently been defined as the price a buyer is willing to pay after considering all of the uses that the property may be put to where such uses are not speculative, remote or contrary to law. West Jefferson Levee Dist. v. Coast Quality, 93-1718 (La. 5/23/94), 640 So.2d 1258. In determining fair market value of the land taken in an expropriation case, consideration is to be given to the most profitable use to which the land can be put by reason of its location, topography, and adaptability. City of Shreveport v. Abe Meyer Corp., 219 La. 128, 52 So.2d 445, 447 (1951), affirmed as amended , 223 La. 1079, 67 So.2d 732 (1953) ; State, Dep't of Highways v. Rapier, 246 La. 150, 164 So.2d 280 (1964). This theory, of taking the latter factors into consideration, is commonly known as the "highest and best use" doctrine. The highest and best use of land in expropriation cases involves several factors. Factors which may be considered include:
• market demand;
• proximity to areas already developed in a compatible manner with the intended use;
• economic development in the area;
• specific plans of business and individuals, including action already taken to develop the land for that use;
• scarcity of the land available for that use; negotiations with buyers interested in the property taken for a particular use; absence of offers to buy the property made by the buyers who put it to the use urged; and
• the use to which the property was being put at the time of the taking.
State, through the Dept. of Highways v. Constant , 369 So.2d 699, 702 (La. 1979).
It is "well established" that the current use of the property is presumed to be the highest and best use and the burden of overcoming that presumption by proving the existence of a different highest and best use based on a potential, future use is on the landowner. Exxon Pipeline , 00-2535, 00-2559, p. 8, (La. 5/15/01), 788 So.2d 1154, 1160. Where a landowner overcomes the presumption, the landowner is entitled to compensation based on a potential use of the property, even though the property is not being so utilized at the time of the taking, provided he can show it is reasonably probable the property could be put to this use in the "not too distant future." West Jefferson Levee Dist. , 640 So.2d at 1273.
In this case, the use to which Violet was putting the Property at the time of the expropriation - layberthing with a limited cargo operation - is presumed to be the Property's highest and best use. Violet, *98 however, may overcome this presumption by demonstrating, by a preponderance of the evidence, that the property could be used in a different, more valuable way, that the potential use is not speculative, and that it could be undertaken in the "not too distant future." Exxon Pipeline , 00-2535, 00-2559, pp. 8-9, 788 So.2d at 1160-61 ; West Jefferson Levee Dist. , 640 So.2d at 1273.
The majority's failure to provide a complete analysis of the "highest and best use" gives me pause. As stated above, the current value of the Property is presumed to be the highest and best use, and the burden of overcoming that presumption by proving the existence of a different highest and best use based on a potential, future use is on Violet, the landowner. The majority fails to provide any substantive discussion of Violet's expert's analysis of the factors supporting the "highest and best use" of the Property as a multimodal bulk cargo facility, so as to satisfy Violet's burden. Instead, the majority addresses only the conclusions of the Port's expert that the attributes of the Property were "problematic," and that Violet's experts used "extraordinary assumptions" and a "flawed" rationale. There is no express finding that Violet failed to overcome the presumption, and why.
Although I do not, at this time, challenge the majority's conclusion with respect to the "highest and best use" of the Property, I cannot support it, as I find the majority's analysis of this issue provides an incomplete roadmap for reaching its decision.
I respectfully dissent.

St. Bernard Port is a public corporation and political subdivision of the State of Louisiana. La. R.S. 34:1701, et seq.

Violet Dock Port, LLC, is a privately-held family business that was in operation for over 40 years until it ceased to exist after St. Bernard Port's quick-taking of its business and assets.

La. R.S. 19:141 states:
In any suit for the expropriation of property, including the fee simple title and servitudes, all port commissions and port authorities created by the constitution or statutes of Louisiana; Louisiana State University and Agricultural and Mechanical College; the Department of Public Works, State of Louisiana and the Sabine River Authority, State of Louisiana, may acquire the property prior to judgment in the trial court in the manner provided in this Part.
Pursuant to this statute, St. Bernard Port is allowed to effectuate statutory quick-takings where title and possession transfers immediately upon the filing of an expropriation suit and estimated compensation is deposited in the registry of the court prior to final judgment deciding whether the taking was for a public purpose and the final amount of compensation-a benefit which does not apply to general expropriations. See generally, La. R.S. 19:1 et seq.

In 1974, the Louisiana Constitution was re-worded to provide that an "owner shall be compensated to the full extent of his loss" when land is expropriated. La. Const. Art. I, § 4 (B)(5). Previously, a property owner could only receive the fair market value and any severance damages for property taken through expropriation. The change permits a property owner to remain in an equivalent financial position to that which he enjoyed before the taking. See generally, State Through Dep't of Highways v. Bitterwolf, 415 So.2d 196 (La. 1982).

The differing valuations of the total just compensation awarded in my dissent and the majority opinion are set forth on the following chart:
Property Expropriated Lobrano Dissent Majority Opinion Docks and Other Improvements $ 29,000,000 $ 24,802,685 Not depreciated Depreciated Upland $ 3,857,238 $ 1,843,000 Plot Y $ 35,565 Included in totals Batture $ 5,125,000 $ 2,119,000 Total Just Compensation $38,017,803 $ 28,764,685

La. R.S. 19:156 states:
If the compensation finally awarded exceeds the amount so deposited, the court shall enter judgment against the plaintiff and in favor of the persons entitled thereto for the amount of the deficiency.
The $16 million deposited into the registry of the court has been released to Violet Port.

La. R.S. 19:155 states:
The judgment rendered therein shall include, as part of the just compensation awarded, interest at the rate of five per centum per annum on the amount finally awarded as of the date title vests in the plaintiff to the date of payment; but interest shall not be allowed on so much thereof as has been deposited in the registry of the court.

La. R.S. 19:8(A)(3) states in pertinent part:
After hearing evidence on the issue, the court shall determine the highest amount offered. If the highest amount offered is less than the compensation awarded for the property and severance damages, if any, the court may award reasonable attorney fees to the defendant.

"Although the usual method of calculating replacement cost includes a reduction for depreciation, this is not necessarily required in every case. Depreciation is designed to deduct for functional obsolescence, i.e., incurable depreciation....We conclude from all of this that depreciation is only deductible in appropriate circumstances." Monroe Redevelopment Agency v. Succession of Kusin, 398 So.2d 1159, 1161 (La.App. 2 Cir. 1981) (citations omitted). In this case, the property owners presented uncontradicted evidence that two warehouses and a showroom were indispensable parts of their furniture business. The court found that under the Constant principle, the trial court was completely justified in awarding the replacement cost of replacing the taken improvements to the land. The trial court's award for the full amount it would take to replace the warehouses and showroom, without allowance for depreciation of the buildings, which admittedly were old, was affirmed. Id.

The development of our public ports is critical to promote economic development in our state. But we must be mindful that a public port expropriates property in furtherance of port business and, at times, may be in competition with private industry. In its amici brief , various port authorities argue that they have "a vested interest in assuring that all public ports throughout the State, including the St. Bernard Port & Harbor Terminal District, are not forced to pay an amount above fair market value for property that must be acquired through expropriation." First, the proper measure of damages is not fair market value, but rather the "full extent of loss" standard. Second, an equally compelling argument can be made that if a private owner of property is not compensated to the full extent of the loss, private port development will be stifled for fear that an investment made in port facilities today will be subject to expropriation tomorrow at a value less than the full extent of its loss or less than replacement cost. Unlike an expropriation for levee improvements, roads, bridges, drainage servitudes, and other similar public purpose projects, where governmental agencies, such as public ports, possessing power to quick-take private property and compete with private industry, courts should use heightened scrutiny and analysis when balancing the rights of private ownership with the state's rights to expropriate property for a public purpose. Moreover, a governmental agency's fiscal ability to ultimately pay a just compensation award in a quick-taking suit is not a factor that courts are allowed to consider. The courts should not be used as a safety net to rescue governmental agencies that make risky financial decisions affecting the public fisc. Although governmental agencies can quick-take private property, nothing prevents them from utilizing the more fiscally conservative general expropriation procedures.

Oubre depreciated the improvements by $10,898,146 due to "physical incurable obsolescence," see infra n. 33 at p. 76-77, and further deducted $4,371,055 for "entrepreneurial incentive." This latter term has been defined as compensation to the entrepreneur for going at risk to build an asset, and relies on the principle that any building project would include economic reward above and beyond direct and indirect costs sufficient to convince an take risk associated with that project in that market. Appraisal Institute, The Appraisal of Real Estate entrepreneur to 573 (14th ed. 2013). "Entrepreneurial incentive" has also been defined as "a marker-derived figure that represents the amount an entrepreneur expects to receive for his or her contribution to a project and risk."The Appraisal of Real Estate, 389 (13th ed. 2012). Notably, Cantrell, added, rather than deducted, entrepreneurial incentive in his calculation of an appropriate valuation of the property.

The fact that this batture is self-scouring means that the movement of water in the area removes any build-up of any debris and vegetation that might decrease the level of the water and, thus, reduces or eliminates dredging maintenance costs.

Other site improvements included parking lots, interior circular roads, elevated office building, warehouse, fencing and gates, perimeter and interior security fencing for the crews and maintenance personnel aboard the ships, fill material, mechanical equipment, sewage pump, diesel tanks, and electrical components for the office building and warehouse. In addition, Violet Port owned all its own construction equipment.

Some of the experts refer to "dry bulk," others to "solid bulk;" these terms are interchangeable for most part and for the purpose dissent.

Violet had entered into an option agreement with Vulcan.

The experts referred to this as a "multi-modal" or "tri-modal" bulk cargo facility. "Multi-modal transport" usually refers to in this case as the transportation of goods with at least two different means of transport. "Tri-modal" as used herein means three different modes of transportation, such as river, road, and rail.

Phase I consisted of land acquisition and short-term improvements at strategic locations within the site to make the existing facilities useful for stevedoring activities. The basis of the application was the immediate need for additional laydown on shore for dry bulk commodities; the initial phase would be at Dock 5, the furthest downstream.

See La. Const. Art. I, § 4 (B)(1), which prohibits the taking or damaging property for predominant use by any private person or entity. La. Const. Art VI, § 21 (A) permits public ports to acquire land through expropriation and lease that land to a private entity for management of the operations. Cf. Kelo v. City of New London , 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005).

Contained in the 2008 PPA was a letter from Associated Terminals to St. Bernard Port, wherein Associated Terminals outlined its commitment to lease and operate the "Violet Dock terminal."

In St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., LLC , 16-96,16-262, 16-331 (La. App. 4 Cir. 12/14/16), 229 So.3d 626, I dissented, finding that the quick-taking was unconstitutional because St. Bernard Port made no pretext about taking over Violet Port's Navy contracts and business and that such a quick-taking violated Louisiana's Private Business Enterprise Protection Clause fund in La. Const. Art. I, § 4 (B)(6), which reads that "[n]o business enterprise or any of its assets shall be taken for the purpose of operating that enterprise or halting completion with a government enterprise...." I found that this protection clause was violated because one of the purposes for taking Violet Port's business enterprise and its assets was to operate its layberthing business and to halt its expanding cargo operations that were competing with St. Bernard Port's own business activities.

St. Bernard Port, Harbor & Terminal Dist. v. Violet Dock Port, Inc., LLC , 17-0434 (La. 5/26/17), 221 So.3d 853.

Because both the majority and I agree that "just compensation" in this case requires a determination of replacement costs of the property's improvements plus the market value of the land and batture, I have omitted the testimony of those who had no direct bearing on these issues. Although I mention the income method of appraisal as used by St. Bernard Port's expert in arriving at the $16 million value, I find this amount deficient and not supported by the evidence.

Scafidel's Ph.D. is in Education Administration.

Phase II represented the solid bulk terminal, which would feature the development of a solid bulk tank farm, rail access and storage facilities, a pipe network, and other dock improvements. Phase III represented the liquid bulk terminal, featuring the development of a liquid bulk tank farm, rail access and storage facilities, a pipe network, and other dock improvements.

It was estimated that Phase I would take approximately nineteen months to complete.

Leased Fee is the ownership interest that the landlord or lessor maintains in a property under a lease with the rights of use and occupancy being conveyed or granted to a tenant or lessee, i.e., the ownership interest in a leased property. Fee Simple is absolute ownership unencumbered by any other interest or estate, subject only to the limitations imposed by the governmental powers of taxation, eminent domain, police power, and escheat. Appraisal Institute, The Dictionary of Real Estate Appraisal , 5th ed. (Chicago: Appraisal Institute, 2010). Thus, Truax's leased fee analysis looked not only at the lease in place but also assumed two additional leases, the Navy lease and a lease for bulk cargo. It should be noted, however, that Ragas testified that, based on his review of Truax's report, Truax basically treated a leased-fee analysis and a fee-simple analysis as synonymous in terms of what he tendered. Even if Truax performed a leased-fee analysis while Oubre performed a fee-simple analysis, they both agreed on the same number of $16 million.

Truax testified that it was his understanding that Violet Port did little by the way of cargo operations. He denied knowledge of the number of cargo jobs performed by Violet Port over the years.

Using a replacement cost approach, Truax's 2010 appraisal lists total replacement costs for the Docks: Dock 1, $8,116,680; Dock 2, $11,932,800; Dock 4, $4,856, 500; and Dock 5, $6,050,000. Due to the condition of Dock 3, no replacement cost was given by him.

Oubre admitted that he had not previously done any appraisal work of this nature.

Oubre was not asked to review Truax's updated report of 2013.

The majority rounded this number down to $3,962,000.

Oubre later removed the entrepreneurial incentive finding no reason to apply it to the circumstances of this case.

"Incurable physical deterioration," is defined as: "[A] form of physical deterioration that cannot be practically or economically corrected as of the date of appraisal." Appraisal Institute, The Dictionary of Real Estate Appraisal , 5th ed. (Chicago: Appraisal Institute, 2010).

"Functional obsolescence," is defined as: "[T]he impairment of functional capacity of property according to market tastes and standards." Id.

As reflected in his report, using an income approach, Oubre valued the property at $14,700,000. Because it was a special use property, he gave a final value of $16 million. Oubre stated that, while he had seen Truax's report before performing his own appraisal, he did his own independent review and that Truax's report did not influence him in any way.

Conversely, Truax made his depreciation calculations based on a useful life of 30 years for the docks.

"Curable physical deterioration," is defined as: "[A] form of physical deterioration that can be practically and economically corrected as of the date of appraisal." Appraisal Institute, The Dictionary of Real Estate Appraisal , 5th ed. (Chicago: Appraisal Institute, 2010).

"External obsolescence," is defined as: "[A]n element of depreciation; a diminution in value caused by negative externalities and generally incurable on the part of the owner, landlord, or tenant." Id.

Cantrell stated that building a commodities terminal would require a significant investment but that it was reasonably and physically feasible based on comparable sales and the conceptual drawings by St. Bernard Port.

Cantrell used the numbers provided by Lanier.

Plot Y is 4.02 acres on the east side of St. Bernard Highway. Cantrell stated in his review of Truax's report that the highest and best use of this acreage is parking for Violet Port employees. Truax thought that the "excess" land was not necessary for effective use of the site and "should be sold separately for speculation."

Cantrell originally applied 25 percent depreciation to all the docks. After Oubre reviewed his report, Cantrell realized that he was wrong in that all the docks had different designs, used different materials, had different replacement costs, and different useful lives.

See supra n. 3 at p. 63.

Ragas testified that the seller does not dictate the property's highest and best use in the market. The seller can only offer the property for sale and the buyers ascertain that they think they can and cannot do with it and bid accordingly. Based on the evidence in the record, St. Bernard Port believed that it could use the subject property for dry and liquid bulk cargo.

The following chart reflects the three engineer's valuations for the full replacement cost of the improvements without a deduction for depreciation:
IMPROVEMENTS TRUAX FLOWER JACQUAT Dock 1 $ 8,116,680 $ 10,025,370 $ 15,656,678 Dock 2 $ 11,932,800 $ 12,686,278 $ 22,030,156 Dock 3 $ 0 $ 2,669,624 $ 6,095,168 Dock 4 $ 4,856,500 $ 3,481,000 $ 6,308,950 Dock 5 $ 6,050,000 $ 8,406,500 $ 10,244,672 SITE $ 290,000 Included in totals $ 5,091,341 EQUIPMENT Included in totals Included in totals $ 3,571,881 TOTAL $ 31,245,980 $ 37,268,772 $ 68,998,846
I agree with the majority in awarding Violet Port the value of other site improvements and equipment located on the property. It is unclear from the majority opinion as to the amount that was awarded for these other site improvements. Nevertheless, my replacement cost award of $29 million includes site improvements and equipment. Also, Dock 3 could be viewed as not indispensible to Violet Port's business and, as such, I do not give it any significant value.

I find that the full replacement cost of the improvements of $68,998,846 provided by Jacquat on the high end. Jacquat used uniform unit prices of $350 and $450 per square foot to reconstruct the docks without taking into account the differences between the docks and their improvements. Other experts indicated that this amount was high and Violet Port failed to produce sufficient evidence to support this amount.

The revision in 1974 to include expansive constitutional language has prompted courts, when referring to a property owner's due in expropriation cases, to abandon the term "just compensation" in favor of the more comprehensive "full compensation." Villavaso, 14-1277, p. 7, 183 So.3d at 763, citing State, Dep't of Transp. & Dev. v. Sonnier , 503 So.2d 1144, 1146 (La.App. 3d Cir.), writ denied , 506 So.2d 1230 (La. 1978).

In Constant , the Court stated:
In the present case, however, the depreciation theories are of an essentially theoretical nature insofar as their effect upon the actual serviceability and economic value of the nature of the property (the loading strip) taken. Its replacement cost is appropriate, because of its unique and indispensable value to the defendants' business operations conducted at the site.
Therefore, under the evidence in the present record, we find the replacement cost of the asset taken is an appropriate measure of the damages by which to compensate fully the landowners for their holding area taken, and without any deduction for alleged depreciation occasioned by their prior use of the taken asset to be replaced. (Emphasis added.) Id. at 707.

In Burnette v. Stalder , 00-2167, pp. 6-7 (La. 6/29/01), 789 So.2d 573, 577, the Court stated:
The function of statutory interpretation and the construction to be given legislative acts rests with the judicial branch of government. Louisiana Rev. Stat. § 1:3 also provides that, when interpreting the revised statutes, courts shall read and construe statutory words and phrases in their context and in accordance with the common and approved usage of the language. See also La. Code Civ. Proc. art. 5053 (same).
Accordingly, the starting point for the interpretation of any statute is the language of the statute itself, while being mindful that the paramount consideration for statutory interpretation is always the ascertainment of the legislative intent and the reason or reasons which prompted the legislature to enact the law. Therefore, when the apparent meaning of the statute appears doubtful or the language can reasonably be interpreted in more than one manner, courts must search deeper to discover the legislative intent. Id. (Citations omitted.)

Nevertheless, Art. I, § 4 does not specify how to fully compensate a property owner whose property is taken. Dietrich, 555 So.2d at 1358.

In his dissent to the majority opinion in St. Bernard Port , Justice Weimer continued the legislative history of Article 1 § 4 of the 1974 Constitution :
With the above-detailed protections added to and enshrined in Article I, § 4, the 1974 Constitution"goes beyond other state constitutions, including our 1921 Constitution, and the federal constitution in limiting the power of government to regulate private property." State v. 1971 Green GMC Van , 354 So.2d 479, 486 (La. 1977).
However, the citizens of Louisiana did not stop there, demonstrating an adamant and emphatic determination to protect private business from government takeover. When property rights protected by the federal constitution were seemingly eroded by the United State Supreme Court's ruling in Kelo v. City of New London, Connecticut, 545 U.S. 469, 125 S.Ct. 2655, 162 L.Ed.2d 439 (2005), the Louisiana electorate responded by enshrining additional protections in our state constitution. See 2006 La. Acts 851, § 1 (approved September 30, 2006). These protections include a prohibition from taking property "for predominant use by" or "transfer of ownership to any private person," and the inclusion of a more "limited" definition of "public purpose." See La. Const. art. I, § 4 (B)(1)(a) and (b); Id. , § 4 (B)(2). Furthermore, in a rejection of the core holding of Kelo , the Louisiana electorate added the following prohibition: "Neither economic development, enhancement of tax revenue, or any incidental benefit to the public shall be considered in determining whether the taking or damaging of property is for a public purpose ...." La. Const. art. I, § 4 (B)(3).
As evidenced by the above, Louisiana has a long and storied history of protecting private property interests from undue governmental interference. Nowhere is that strong interest more evident than in the protections extended under La. Const. art. I, § 4 (B)(6), ["Louisiana's Private Business Enterprise Protection Clause"], protections unique to Louisiana, but entirely consistent with the core principles underlying Louisiana's interest in protecting private property rights.
St. Bernard Port , 17-0434, pp. 3-4, 239 So.3d at 256-57 (Weimer, J., dissenting). (Emphasis added.)

St. Bernard Port argues that in determining the fair market value of the upland, Plot Y, and batture, Exxon Pipeline , supports its position that Violet Port should only be awarded for a depreciated replacement value as opposed to a full replacement value. This argument lacks merit. While instructive, Exxon Pipeline is quite distinguishable and does not support this argument The facts of Exxon Pipeline did not deal with improvements such as those owned by Violet Port, and the property in Exxon Pipeline was not considered to be "unique and indispensable" as discussed in Constant .

In Hecker , the DOTD expropriated for highway purposes property operated by the defendants/property owners as a bulk oil distribution facility, a business successfully operated by them for many years. From the property owner's point of view, it was essential to continue the business in that he was not ready to retire and had expected to continue his business at the old plant indefinitely. The facility required little maintenance and he had adequate storage if the business expanded. Finding no replacement facility in New Orleans, they purchased another property in Jefferson Parish and built a new facility. The improvements were basically a duplication of the old facility, consisting of large storage tanks, warehouse, loading dock, paving, and fencing. The property owners' position was that the only appropriate method of valuation was the actual cost of replacement, undiminished by any allowance for depreciation of the expropriated property. In order to be fully compensated for their loss, they argued that they be awarded total land acquisition and construction costs, financing costs, and income foregone from other assets which they liquidated to pay for the new facility. The defendants' appraisers testified that the site purchased was the only available property with the correct zoning, M-2 heavy industrial. No improved property existed to which the property owners' operation could move. One appraiser stated that because of new rules and requirements a larger site was required to produce the same storage capacity. In order to build at the new site, the property owners had to get a variance from the Jefferson Parish moratorium for building bulk plants.

In general terms, "depreciation," includes physical depreciation, functional obsolescence, and external obsolescence, the application of which is contrary to Constant and its line of cases.

I find St. Bernard Port's argument, that Violet Port could have easily moved its layberth business and rebuilt the necessary improvements to continue, disingenuous at best. In 2008, St. Bernard Port represented to the DOTD that Violet Port was the only place where it could expand its business; the two other alternatives were undesirable for a number of reasons. These alternatives would have also prevented Violet Port from using them for its own operations.

56 UPLAND UPLAND BATTURE BATTURE LAND & PRICE/SF TOTAL PRICE/LF TOTAL BATTURE OUBRE $ 1.00 $1,843,000 $ 500 $ 2,119,000 $ 3,962,000 Majority TRUAX $ 1.25 $2,129,180 $ 575 $ 2,450,000 $ 4,580,000 CANTRELL $ 2.30 $3,857,238 $ 1,000 $ 4,200,000 $ 8,211,000 Lobrano Dissent RAGAS $ 4.00 $6,440,000 $ 1,250 $ 5,125,000 $ 11,470,000 Lobrano Dissent
The majority rounds down Oubre's value of the upland to $1,843,000.

The majority opinion is unclear as to whether it found that the "highest and best use" of the land and batture was "layberthing with a limited cargo operation" or that "the highest and best use of the property to be layberthing." Also, Oubre gave various opinions on "highest and best use." When explaining the "vast discrepancy" in the values set by the myriad of experts, the majority states that the "lower calculations were based on layberthing with a limited cargo operation ." Later in the opinion, the majority accepts the testimony of Oubre, whose testimony "supports the highest and best use of the property to be the layberthing operations that Violet Port was using the property for at the time of the expropriation ." (Emphasis added.) However, Oubre also testified that, in his opinion, the property was not suitable for liquid terminals, he did think that bulk cargo was feasible. Clearly, the majority awards nothing to Violet Port for the loss of its current and/or proposed cargo operations in light of the option it had entered into with Vulcan Materials for expanded cargo operations at Dock 4, which was renovated for this specific purpose.

The majority states that: "In reviewing the testimony regarding the rationale for the differing appraisals, we find that Mr. Oubre's testimony realistically evaluated the character of the property. Mr. Oubre acknowledged how specialized the property was while also taking into account the attributes that were problematic." I cannot reasonably determine on which "problematic attributes" the majority relies in reaching its conclusions and relying on Oubre.

Cantrell testified that, in his opinion, the highest and best use was layberthing and transitioning into bulk commodities storage with highway and railroad access. Ragas testified that, in his opinion, the highest and best use of the property was "a Special Purpose Multi Modal Cargo and Berthing Facility...suitable for Bulk (Dry and Liquid)" with layberthing for the Navy ships, topside repairs, dry bulk cargo storage/shipment and a variety of liquid bulk cargo types for shipping internationally.

Ragas valued Plot Y at $99,000, and Cantrell valued Plot Y at $151,000. Violet Port failed to produce sufficient evidence to allow for these higher values.

La. R.S. 19:9 recognizes that a property owner should receive "any general or specific benefits" that he or she derives from any "contemplated improvement or work" but "the basis of compensation shall be the value which the property possessed before the contemplated improvement was proposed." It is noted that the general rule is that the value of the property expropriated should be determined and fixed considering the property as of the time of the taking but not enhanced by the purpose of the taking. Nevertheless, property owners are entitled to receive compensation for land at an enhanced value by reason of its "proximity to areas already developed in a compatible manner with the intended use" of the property by the expropriating authority. See St. Charles Land Co. II, L.L.C. v. City of New Orleans ex rel. New Orleans Aviation Bd., 14-0101, p. 10 (La.App. 5 Cir. 12/23/14), 167 So.3d 128, 136. St. Bernard Port's argument that any amount over $16 million would be a prohibited enhanced amount lacks merit. The market demand for cargo operations, scarcity of quality river frontage, and the location and great attributes of the Violet Port site are some of the factors for arriving at a value over $16 million. St. Bernard Port failed to show otherwise.

See supra n. 57 at p. 92.

Of course, this conflicts with one of Oubre's opinion of "highest and best use" of the property.